

NUMBER 13-07-00511-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

| | |
|---|---|
| **JACOB DWIGHT DAVIS,** | **Appellant,** |

**v.**

| | |
|---|---|
| **THE STATE OF TEXAS,** | **Appellee.** |

## On appeal from the 377th District Court of Victoria County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Garza and Vela
### Memorandum Opinion by Justice Garza

Appellant, Jacob Dwight Davis, was charged by indictment with aggravated robbery, a first-degree felony.[1]  *See* TEX. PENAL CODE ANN. § 29.03 (Vernon 2003).  After a trial before a Victoria County jury, Davis was convicted of the offense.  The jury sentenced Davis to sixty years' imprisonment in the Texas Department of Criminal Justice-Institutional

---

[1] The punishment range for a first-degree felony is "not more than 99 years or less than 5 years." TEX. PENAL CODE ANN. § 12.32(a) (Vernon 2003).

Division and assessed a $10,000 fine. On appeal, Davis argues that: (1) the evidence adduced at trial was legally and factually insufficient to establish the use or display of a deadly weapon in connection with a robbery; (2) the evidence was factually insufficient to connect Davis to the alleged aggravated robbery; and (3) his trial counsel provided ineffective assistance of counsel. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On May 3, 2007, a Victoria County grand jury indicted Davis with aggravated robbery. The indictment provided the following, in relevant part:

> JACOB DWIGHT DAVIS . . . on or about the 29th day of March A.D., 2007, . . . did then and there, while in the course of committing theft of property and with intent to obtain or maintain control of said property, intentionally and knowingly threaten or place MICHAEL DEMAS in fear of imminent bodily injury or death, and the defendant did then and there use or exhibit a deadly weapon, to wit: a firearm, that in the manner of its use or intended use is capable of causing death or serious bodily injury.[2]

### A. State's Evidence

Ashley Godfrey and Stephanie Gallaher testified that on March 29, 2007, they arrived at the Maximus Gentlemen's Club in Victoria, Texas, between 1:00 a.m. and 2:00 a.m. The purpose of their visit was to meet Taylor Kelly, a friend of theirs from high school. Kelly worked at the club as a waitress. Once Godfrey and Gallaher arrived at the club, three males and one female congregated by their car and followed them as they walked towards the club. Godfrey testified that the four individuals wore black hooded sweatshirts

---

[2] The indictment further provided that:

Prior to the commission of the aforesaid offense (hereafter styled the primary offense), on the 18th day of April, A.D. 2002, in cause number 2-3912 in the County Court of Victoria County, Texas, a juvenile court, the defendant was adjudicated under Section 54.03, Family Code, to have engaged in delinquent conduct constituting the felony offense of Burglary of a Habitation, committed on June 26, 2001[,] for which the defendant was committed to the Texas Youth Commission under Section 54.04(d)(2) Family Code, and was not for a state jail felony punished under Section 12.35(a).

2

and were intimidating. Once Godfrey and Gallaher reached the door to the club, the three males and one female "gathered around us [Godfrey and Gallaher] and wouldn't let us in the bar." Godfrey and Gallaher both noted that one of the males in the group placed his arm on the door to prevent the girls from entering the club. Godfrey and Gallaher, however, were able to successfully enter the club despite the group's efforts.

The group followed Godfrey and Gallaher into the club. Upon entering the club, Godfrey and Gallaher encountered the club's bouncer, Michael Demas. Demas refused to grant Godfrey and Gallaher permission to enter the club because neither Godfrey nor Gallaher were escorted by a male or were at least twenty-one years old. In any event, Godfrey and Gallaher notified Demas that they: (1) were being followed by a group of three males and one female; (2) were afraid to go back outside; (3) did not want to go back outside by themselves; and (4) were there to see their friend, Kelly. Demas, however, continued to insist that Godfrey and Gallaher could not enter the club. Demas subsequently turned his attention to the group of people behind Godfrey and Gallaher.

The testimony at trial established that the group of people behind Godfrey and Gallaher was comprised of two African-American males, one possibly Hispanic male, and an African-American female. Demas, Godfrey, and Gallaher each testified that the group of individuals was acting strangely prior to and during their interaction with Demas. Demas testified that the group moved along the wall of the club, never showing their backs to him, which, according to Demas, was strange. Demas further testified that the leader of the group, a tall, dark-skinned African-American later identified as Davis, never paid the cover charge to get into the club, and that Davis never made eye contact with Demas. Instead, Davis looked around the club suspiciously. Demas suspected that Davis was "casing" the

3

club. Godfrey stated that Davis was jumping around and saying that he was paranoid. Godfrey noticed that Davis's eyes were dilated, he was jittery, and he was shaking. Gallaher believed that Davis was on drugs because he was pacing back and forth. While Demas was dealing with Davis and his friends, Kelly met up with Godfrey and Gallaher in the doorway of the club. Shortly thereafter, Davis grabbed the tip jar that was at Demas's station and proceeded to quickly exit the club. Demas pursued Davis and eventually caught up to him. Demas wrestled with Davis, forced him to the ground, and retrieved the tip jar. At the time that Davis absconded with the tip jar, eyewitnesses were unable to pinpoint the location of the rest of the group members.

Seconds later, Davis returned to the club aiming a firearm at Demas's head. As Davis raised the firearm to Demas's head, Demas yelled "[g]un" and ran away from Davis. Chaos ensued inside the club. The lights in the club were turned out, and the patrons of the club scurried to safety. Godfrey recalled hiding near the cash register and Gallaher hid in the men's restroom. Kelly testified that she was knocked against the wall of the club, and that during the ruckus, she dropped the tips that she had earned that night. As everyone in the club ran for cover, Kelly kneeled to recover the tips that she had dropped on the floor and observed Davis with the firearm raised.[3] According to several eyewitnesses, Davis pulled the trigger of the firearm repeatedly, producing at least three audible "clicks."

After realizing that his firearm had malfunctioned, Davis proceeded to the nearby cash register. Demas testified that Davis fumbled around with the cash register while still holding the firearm up. While Davis fumbled around with the cash register, Demas found

---

[3] Kelly and Demas identified Davis as the gunman and as the individual who stole Demas's tip jar.

4

an empty beer bottle that he intended to use as a weapon to ward off Davis. Demas then pursued Davis with the beer bottle. Davis, unable to get the cash register open and seeing Demas with the beer bottle, fled the club. Demas then threw the beer bottle at Davis, but Davis was able to escape the club unharmed. Demas identified a picture of a black revolver found near the club as the one Davis used in the club. Demas testified that the police came to investigate the scene within five minutes of Davis's escape from the club.

Katie Martinez, a nursing student living in the apartment complex next to the club, testified that there is an alleyway between her apartment and the club and that her mother and grandmother, while sitting near a window in the apartment, overheard a group of people exclaim "[c]hunk it, chunk it, the cops are coming" from the nearby alleyway. At this point, Davis's trial counsel objected to Martinez's testimony as hearsay. The State argued that Martinez's mother and grandmother immediately told Martinez about the incident and that the statements were admissible under the present sense impression exception to the hearsay rule. *See* TEX. R. EVID. 803(1). After a conference at the bench, the trial court overruled Davis's objection. Martinez then noted that her mother said, "Come, look, look, look, they're running from the cops, they've thrown something." Martinez admitted that she did not ever see any object thrown, and that she only saw the police when she arrived at the window.

Officer Kevin Wilkins of the Victoria Police Department testified that he responded to a dispatch call pertaining to the club at 1:30 a.m. on March 29, 2007. With respect to the nature of the call, dispatch told Officer Wilkins that "[t]hey said a subject with a gun had pulled it out on someone at Maximus and they had fled, fled the scene." Officer Wilkins noted that:

Whenever I first pulled up I saw a White male, it was Mr. Demas, the victim, he came out. And there was two other males in the parking lot. And he said man, this guy just pulled a gun on me, he's wearing a gray sweater with the number seven on it. And the other two . . . males, I didn't get them identified because we were in a hurry. They said they ran north, we saw them come around the fence.[4]

. . . .

And that's the description I had, a Black male, and they said that there was—there was a total of four subjects, there was a Black female and two Black males, I think a Hispanic male, we weren't sure. He said we know it was three guys and a girl.

Officer Wilkins found the group in the apartment complex where Martinez lived. Officer Wilkins stated that "[t]hey were in front of I believe it was Apartment Number 2. They [the three males and one female] were huddled down real quiet and then we saw them." One of the members of the group matched the description of the gunman provided by Demas. Officer Wilkins proceeded to apprehend the group and instructed Demas to identify the perpetrator; Demas identified Davis as the gunman.

Davis was subsequently arrested and read his *Miranda* rights. *See generally Miranda v. Arizona*, 384 U.S. 436 (1966). Davis identified himself to law enforcement as Asian Perry, a false alias. Police, however, were able to identify later Davis based on a tattoo he had on the back of his neck, stating "Mae-Mae." Officer Wilkins testified that one would have to get close to Davis in order to view the tattoo and that it did not seem like Davis was on drugs. Instead, Davis just glared at Officer Wilkins when asked questions and was generally uncooperative.

Detectives Jonathan Allen and Kevin Kroos of the Victoria Police Department

---

[4] Several witnesses testified that there is a fence in between the Maximus club and the apartments where Martinez lived.

6

coordinated the investigation under the supervision of Sergeant Olga Gamez. In searching the area surrounding the club and the apartment complex in which Martinez lived on the night of the incident, police were unable to find a firearm. A black revolver—a Taurus .38 Special—was found the next day in front of a storage building near the club and behind the apartment complex. In the process of searching for the revolver, Detectives Allen and Kroos encountered a woman who identified herself as a resident of the apartment complex.[5] She told the detectives that she was awakened the previous night by someone yelling "Throw it, throw it, the cops."

Detective Allen testified that, based on his training and experience, the revolver would have made a click noise if it had misfired and that the revolver appeared to have "five expended ammunition cartridges or brass casings."[6] Detective Allen did not search the revolver for fingerprints, but he believed that Detective Kroos had submitted the revolver to be processed for fingerprints. Detective Allen admitted that the revolver had rust on it, but later testified that rust could have formed on the revolver due to improper care of the revolver. Detective Kroos admitted that neither the tip jar nor the cash register were checked for fingerprints. He also admitted that no fingerprints were found on the revolver but that the revolver constituted a deadly weapon.

Officer Robert Popps, a jailer with the Victoria County Sheriff's Department, testified that Davis was incarcerated in the jail where Officer Popps worked. Officer Popps noted

---

[5] Police never discovered the identity of this woman other than that she was a resident of apartment number 11. Detective Kroos stated that the woman quickly left the scene after disclosing the information to police.

[6] In a statement made to police shortly after the incident, Demas noted that Davis had fired the revolver five times, resulting in five audible "clicks"; however, at trial, Demas testified to only hearing three "clicks."

that he intercepted two letters sent by Davis to his brother, who was housed in the same jail. Officer Popps identified the State's Exhibits 24 and 25 as the letters that he had intercepted from Davis. The letter introduced as State's Exhibit 24 provided the following:

> Erica[7] came to jail for talkin shit to the laws [sic]. I rob [sic] the club for a 1,000 dollars[.] [T]hey can't charge me cause [sic] they don't have the gun. I'm gonna bond out. Soon when they tell me my bond I been out here on some gansta [sic] shit bro fo [sic] real.

The letter introduced as the State's Exhibit 25 provided as follows:

> Say bro I rob [sic] the club for 1,000[.] [T]hey an't [sic] got shit on me coz [sic] they don't have the gun so most likely I'm gonna bond out[.] I got to wait in [sic] see what they [are] gonna do to Erica once they let here [sic] go[.] I'll be alright[.] [T]he only reason why they brought Erica to Jail cuz [sic] she was talkin shit to the laws [sic] . . . . I [have] been out here on some gansta [sic] shit you thought.

Officer Popps testified that both letters were written in the same handwriting and that Davis admitted that the letters were his. Once Officer Popps intercepted the letters, he passed the letters on to his supervisor.

## B. Davis's Evidence

Davis called two witnesses to testify on his behalf—Sergeant Gamez and Officer Edward Flores. Sergeant Gamez testified that no photographs were taken of the crime scene because there was nothing of significance to photograph. She further testified that the police were familiar with Davis because they were investigating him regarding another incident, thus aiding in their identification of Davis based on the tattoo on his neck. Sergeant Gamez noted that she was present when Davis was arrested and that he did not appear drunk or high on drugs when he was arrested. She also noted that Officer

---

[7] Erica is Davis's cousin. The record reflects that her full name is Erica McClure. She testified that she was present with Davis at the club on the night of the incident, and that she lost track of Davis during the alleged robbery because Davis told her that he was going around the corner to use the restroom.

Telamantes[8] was in charge of gathering statements from those who witnessed the incident and that she had never heard of Godfrey, Gallaher, or Martinez. Sergeant Gamez recalled that the tip jar and the register were checked for fingerprints. She was unaware of the results of the fingerprint test on the tip jar, and she stated that Officer Telamantes was unable to get any usable latent fingerprints from the register.

Officer Flores stated that he was present when Davis was processed at the jail, and he filled out the inventory report which was introduced as Defendant's Exhibit 1. The inventory report stated that Davis had the following items, among other things, on his person when he was processed at the jail: (1) four quarters and one nickel; (2) one pen; (3) a black glove; (4) miscellaneous sheets of paper; and (5) two condoms.

The jury subsequently found Davis guilty of aggravated robbery, sentenced him to sixty years' incarceration in the Texas Department of Criminal Justice-Institutional Division, and assessed a $10,000 fine. Davis filed his notice of appeal on August 16, 2007, and the trial court certified Davis's right to appeal on August 20, 2007. On September 14, 2007, Davis filed a motion for new trial and a motion in arrest of judgment, arguing that the evidence was insufficient to support the jury's verdict. The trial court denied Davis's motions on September 19, 2007. This appeal ensued.

## II. LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE SUPPORTING DAVIS'S CONVICTION

In his first three issues on appeal, Davis argues that the evidence adduced at trial did not support a conviction of aggravated robbery. *See id.* § 29.03. Specifically, Davis contends that there was a "temporal disconnect" between the stealing of the tip jar and the return to the club; therefore, the return to the club constituted an entirely different criminal

---

[8] The record is unclear as to Officer Telamantes's first name.

9

episode for which the evidence demonstrated that Davis did not commit theft. In addition, Davis contends that the evidence did not demonstrate that he displayed or utilized a deadly weapon in stealing the tip jar. Davis also asserts that the State did not present factually sufficient evidence connecting him to the offense. The State argues that the stealing of the tip jar and the subsequent return to the club constituted a single criminal episode, and that the evidence adduced at trial pertaining to these two events supports Davis's conviction. The State also argues that the evidence connecting Davis to the offense is factually sufficient because several eyewitnesses identified him as the gunman at the club.

## A. Standard of Review

In conducting a legal sufficiency review, we view the relevant evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)); *Escamilla v. State*, 143 S.W.3d 814, 817 (Tex. Crim. App. 2004). The trier of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given to testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd). We do not reevaluate the weight and credibility of the evidence, nor do we substitute our own judgment for the trier of fact. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000); *Beckham*, 29 S.W.3d at 151. Instead, we consider whether the jury reached a rational decision. *Beckham*, 29 S.W.3d at 151. We must resolve any inconsistencies in the evidence in favor of the judgment. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

In a factual sufficiency review, we review the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust, or the jury's verdict is against the great weight and preponderance of the evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). This Court will not reverse the jury's verdict unless we can say with some objective basis in the record that the great weight and preponderance of the evidence contradicts the verdict. *Id.* at 417.

The State is not required to present direct evidence, such as eyewitness testimony, to establish guilt. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13; *Guevara*, 152 S.W.3d at 49. The law does not require that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13; *Guevara*, 152 S.W.3d at 49.

Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). Under a hypothetically correct jury charge, a person commits aggravated robbery "if he commits robbery . . . and he . . . uses or exhibits a deadly weapon . . . ." TEX. PENAL CODE ANN. § 29.03 (Vernon 2003). Moreover, a person commits robbery "if, in the course of committing theft . . . and with intent to obtain or maintain control of the property, he . . . intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." *Id.* § 29.02 (Vernon 2003). A person acts intentionally with respect to a result of

his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a) (Vernon 2003).

## B. The Evidence Pertaining to the Usage or Display of a Firearm

Davis argues that the State's evidence does not establish that he used or displayed a deadly weapon "in the course of committing a theft." *See* TEX. PENAL CODE ANN. § 29.01(1) (Vernon 2003). Thus, Davis states that he could not have committed aggravated robbery. Davis also argues that he did not steal anything from the club; therefore, no theft occurred.

Section 29.01(1) of the penal code provides that the phrase "in the course of committing a theft" means "conduct that occurs in *an attempt to commit*, during the commission, or in immediate flight after the attempt or commission of theft."[9] *Id.* (emphasis added). In analyzing section 29.01(1), the Texas Court of Criminal Appeals and this Court have held that:

> The offenses of robbery and aggravated robbery, as defined . . . do not require as an element thereof that the property sought actually be obtained. It is sufficient to show an intent to obtain (or maintain) control of the property, an accompanying theft or attempted theft, and the additional acts with requisite intent set forth in Sections 29.02(a)(1) or (2), 29.03(a)(1) or (2) . . . . . Since the actual success of obtaining the property sought is not an element of the offense of aggravated robbery, the fact that the acts tend but fail to obtain the property does not render them insufficient to effect the commission of the offense of aggravated robbery.

*Watts v. State*, 516 S.W.2d 414, 415 (Tex. Crim. App. 1974); *see Earl v. State*, 514 S.W.2d 273, 274 (Tex. Crim. App. 1974) ("Thus the actual commission of the offense of theft is not a prerequisite to commission of a robbery . . . ."); *see also Cates v. State*, No.

---

[9] Section 31.03 of the penal code provides that a person commits theft "if he unlawfully appropriates property with intent to deprive the owner of property." *Id.* § 31.03(a) (Vernon Supp. 2008).

13-95-325-CR, 1997 Tex. App. LEXIS 4833, at *15 (Tex. App.–Corpus Christi Aug. 28, 1997, no pet.) (mem. op., not designated for publication).[10]

Considering only the events surrounding Davis's return to the club, we hold that the evidence adduced at trial is legally and factually sufficient to support his conviction.[11] Godfrey, Gallaher, Kelly, and Demas each testified that Davis entered the club and pointed a firearm at Demas and other patrons of the club. Demas noted that Davis pointed the firearm at his head and pulled the trigger repeatedly, producing several audible "clicks" that were heard by several witnesses. At that time, Demas yelled, "gun," and quickly ran for cover.[12] Shortly thereafter, Demas observed Davis fumbling with the cash register while still aiming the firearm. The jury could have reasonably concluded that this constituted an attempt to commit theft. *See* TEX. PENAL CODE ANN. § 29.01(1). Later, Demas identified

---

[10] Davis cites to case from this Court, *Blount v. State*, 851 S.W.2d 359, 363 n.3 (Tex. App.–Corpus Christi 1993, no pet.), for the proposition that a robbery or aggravated robbery conviction cannot be sustained without a completed theft. We disagree. In *Blount*, this Court explained that "although theft is an integral part of the offense of aggravated robbery, the actual *completion* of a theft is not necessary for conduct to constitute robbery." *Id.* at 364 (citing *Cook v. State*, 840 S.W.2d 384, 389 (Tex. Crim. App. 1992)) (emphasis in original). With respect to theft, the evidence must show that either a theft or an attempted theft occurred. *See id.* If neither a theft nor an attempted theft has occurred, then a defendant cannot be convicted of robbery or aggravated robbery. *Id.* at 363 n.3 (citing *Cook*, 840 S.W.2d at 387); *see Ex parte Santellana*, 606 S.W.2d 331, 333 (Tex. Crim. App. 1980) ("Two criminal acts are implicit in the offense of aggravated robbery: a theft, whether attempted, in progress, or completed, and an assault, which in the instant case was allegedly done by threat with a deadly weapon."). Here, the evidence suggests that an attempted theft occurred and that Davis used a firearm to commit an assault.

[11] Because we conclude that the evidence of the events pertaining to Davis's return to the club is legally and factually sufficient to support his conviction for aggravated robbery, we need not consider the evidence regarding Davis's stealing of the tip jar. *See* TEX. R. APP. P. 47.1.

[12] Davis argues that Demas never testified that he was fearful for his life and that Demas's attempt to ward Davis off using an empty beer bottle indicated that he was not scared of Davis. We disagree. Demas ran into the club screaming "gun" after Davis had aimed the gun at his head; therefore, it would have been reasonable for the jury to conclude that Demas was fearful for his life. In any event, the aggravated robbery statute, section 29.03 of the penal code, provides that a person commits robbery and "(1) causes serious bodily injury; (2) *uses or exhibits a deadly weapon*; or (3) causes bodily injury to another person or threatens or places another person in fear of imminent bodily injury or death . . . ." TEX. PENAL CODE ANN. § 29.03(a) (Vernon 2003) (emphasis added). As previously mentioned, several witnesses testified that Davis used a firearm in the commission of this offense. The court of criminal appeals has held that a firearm is a per se deadly weapon. *See Polk v. State*, 693 S.W.2d 391, 394 (Tex. Crim. App. 1985). Therefore, whether Demas was fearful for his life is irrelevant. *See* TEX. PENAL CODE ANN. § 29.03(a).

13

the black revolver found by police at the nearby apartment complex as the firearm used by Davis in the commission of the offense. Officer Flores's testimony that Davis only had $1.05 on his person at the time of arrest seems to suggest that Davis's attempt to steal money from the cash register was not successful. However, as noted earlier, a successful theft is not required to sustain a conviction for aggravated robbery. *See Watts*, 516 S.W.2d at 415; *Earl*, 514 S.W.2d at 274; *see also Cates*, 1997 Tex. App. LEXIS 4833, at *15.

We find that the cumulative effect of all the incriminating facts suggests that Davis intended to steal from the club's cash register while using a deadly weapon, a firearm. *See* TEX. PENAL CODE ANN. §§ 29.02, 29.03; *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("This standard [the legal sufficiency standard] accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. . . . [W]e determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.") (internal quotations omitted); *Hooper*, 214 S.W.3d at 13; *Guevara*, 152 S.W.3d at 49. We therefore conclude that the evidence demonstrating Davis's use of a deadly weapon in the commission of an aggravated robbery is legally sufficient. *See Hooper*, 214 S.W.3d at 13; *Guevara*, 152 S.W.3d at 49. Moreover, in viewing the evidence in a neutral light, we cannot say that the jury's determination that Davis used a deadly weapon in the commission of this offense is clearly wrong and manifestly unjust or against the great preponderance of the evidence. *See Watson*, 204 S.W.3d at 414-15. Therefore, the evidence was factually sufficient to support that determination.

**C. The Evidence Connecting Davis to the Alleged Aggravated Robbery**

Next, Davis asserts that the testimony of the State's witnesses was inconsistent; therefore, the evidence connecting him to the aggravated robbery was factually insufficient. In particular, Davis contends that the witnesses disagreed about his physical appearance, what he was wearing that night, and his general demeanor prior to the stealing of the tip jar.

Demas testified that Davis was wearing a gray sweater with the number seven on it, and Godfrey and Gallaher recalled that Davis was wearing a black hooded sweatshirt. Demas noted that Davis had a mustache; however, Godfrey could not recall if Davis had a beard or a mustache. Finally, Demas stated that Davis refused to make eye contact with him when Demas was attempting to collect Davis's cover charge and that Davis appeared to be "casing" the club. Godfrey and Gallaher both remembered that Davis was acting strangely, as if he was drunk or on drugs. Kelly, on the other hand, did not recall Davis acting strangely. Davis asserts that these inconsistencies in the testimony render the evidence connecting him to the aggravated robbery factually insufficient.

We note that the jurors were free to accept or reject any or all of the witnesses' testimony that they did not believe to be credible. *See Davila v. State*, 147 S.W.3d 572, 575 (Tex. App.–Corpus Christi 2004, pet. ref'd) (citing *Alvarado v. State*, 818 S.W.2d 100, 105 (Tex. App.–San Antonio 1991, no pet.)); *see also Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008) ("The jury is in the best position to judge the credibility of a witness because it is present to hear the testimony, as opposed to an appellate court who relies on the cold record."). Although there were some inconsistencies in the testimony presented, these inconsistencies were not enough to render the evidence insufficient. *See*

*Davila v. State*, 147 S.W.3d 572, 575 (Tex. App.–Corpus Christi 2004, pet. ref'd) (holding that contradictory testimony from witnesses does not render the evidence insufficient) (citing *Mercado v. State*, 695 S.W.2d 25, 29 (Tex. App.–Corpus Christi 1985), *aff'd*, 718 S.W.2d 291 (Tex. Crim. App. 1986)).

Here, two witnesses—Demas and Kelly—identified Davis in open court as the perpetrator of the offense.[13] Furthermore, Officer Wilkins testified that he presented a lineup to Demas shortly after the incident had occurred, and Demas identified Davis as the perpetrator. Based on the evidence presented, we cannot say that the evidence is so weak that the jury's determination that Davis was the perpetrator seems clearly wrong and manifestly unjust or against the great weight and preponderance of the evidence. *See Watson*, 204 S.W.3d at 414-15. Accordingly, we overrule Davis's first three issues.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

In his fourth issue, Davis contends that his trial counsel's failure to object to the admission of evidence connecting him with the weapon found by police amounted to ineffective assistance of counsel. The State counters by arguing that Davis's trial counsel did object to the admission of evidence connecting Davis with the weapon found by police and that trial counsel's strategy was probably intended to de-emphasize facts presented to the jury.

### A. Applicable Law

To establish ineffective assistance of counsel, Davis must show: (1) his attorney's representation fell below an objective standard of reasonableness; and (2) there is a

---

[13] It is also noteworthy that: (1) Davis, in writing to his brother, admitted that he had robbed a club for $1,000 on the night of the incident; and (2) Erica, his cousin, had spoken to law enforcement about the aggravated robbery at the club where she admitted that she and Davis were in the vicinity of the club at the time the incident transpired.

16

reasonable probability that, but for his attorney's errors, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 684 (1984); *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986); *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.–Corpus Christi 2006, no pet.). Whether this test has been met is to be judged on appeal by the totality of representation, not by any isolated acts or omissions. *Jaynes*, 216 S.W.3d at 851. The burden rests on the appellant to prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) (citing *Cannon v. State*, 668 S.W.2d 401, 403 (Tex. Crim. App. 1984)).

Our review of counsel's representation is highly deferential, and we will find ineffective assistance only if the appellant overcomes the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Jaynes*, 216 S.W.3d at 851. The right to "reasonably effective assistance of counsel" does not guarantee errorless counsel or counsel whose competency is judged by perfect hindsight. *Saylor v. State*, 660 S.W.2d 822, 824 (Tex. Crim. App. 1983). Moreover, the acts or omissions that form the basis of appellant's claim of ineffective assistance must be supported by the record. *Thompson*, 9 S.W.3d at 814; *Jaynes*, 216 S.W.3d at 851. A silent record which provides no explanation for counsel's actions usually will not overcome the strong presumption of reasonable assistance. *Thompson*, 9 S.W.3d at 813-14.

**B. Discussion**

Davis alleges that his trial counsel provided ineffective assistance because he failed to renew an objection to Martinez's testimony regarding her mother and grandmother's

17

statements about the disposal of the gun. Davis suggests that his trial counsel should have continued to object to Martinez's testimony even after the trial court had overruled his objection.

In reviewing the record, we find that Davis is correct in stating that his trial counsel initially objected to Martinez's testimony as hearsay. We also find that trial counsel made numerous other objections to proffered testimony at trial and filed numerous pleadings on behalf of Davis. We must be careful to not analyze trial counsel's performance based on isolated incidents but rather on the totality of his representation. *Jaynes*, 216 S.W.3d 839 at 851. Davis admits that the record is silent as to trial counsel's strategy for not continually objecting to Martinez's testimony. Furthermore, we are not privy to the discussion that took place at the bench prior to the trial court's overruling of trial counsel's hearsay objection.

The Texas Court of Criminal Appeals has recently stated the following with respect to ineffective assistance claims:

> We decline to find counsel ineffective on this basis on the record before us. As we have done many times before, we point out that the record on direct appeal is usually inadequate to address ineffective assistance claims. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). Before granting relief on a claim that defense counsel failed to do something, we ordinarily require that counsel be afforded the opportunity to outline the reasons for the omission. *Id.* To warrant reversal without affording counsel such an opportunity, the challenged conduct must be "so outrageous that no competent attorney would have engaged in it." *Id.*

*Roberts v. State*, 220 S.W.3d 521, 533 (Tex. Crim. App. 2007). Because the record is silent as to trial counsel's strategy, we must examine whether his alleged failure to object to Martinez's testimony is "'so outrageous that no competent attorney would have engaged in it.'" *See id.* (quoting *Goodspeed*, 187 S.W.3d at 392).

18

As mentioned earlier, Martinez testified that her mother and grandmother heard someone exclaim, "[c]hunk it, chunk it, the cops are coming." Martinez later admitted that she neither heard the statements made nor witnessed any object thrown. However, several witnesses identified Davis as the perpetrator of the offense and noted that Davis used a firearm in the commission of the crime. Furthermore, Demas identified the revolver found by police as the firearm that Davis had used.

It is plausible that Davis's trial counsel did not wish to inflame the jury or the court or highlight certain facts by continuously objecting to Martinez's testimony. Furthermore, Davis's trial counsel likely was aware that Texas courts have affirmed convictions even though the alleged deadly weapon was never found. *See Magana v. State*, 230 S.W.3d 411, 414 (Tex. App.–San Antonio 2007, pet. ref'd) (affirming an aggravated assault conviction and noting that the State does not have to introduce the weapon into evidence to prove that it was a deadly weapon) (citing *Morales v. State*, 633 S.W.2d 866, 868 (Tex. Crim. App. 1982)); *see also Hunter v. State*, Nos. 01-00-00722-CR & 01-00-00726-CR, 2001 Tex. App. LEXIS 4532, at **4-6 (Tex. App.–Houston [1st Dist.] July 5, 2001, no pet.) (mem. op., not designated for publication) (affirming a conviction even though the firearm used in the commission of the offense was never found); *Jeffery v. State*, No. C14-84-329-CR, 1985 Tex. App. LEXIS 6581, at *3 (Tex. App.–Houston [14th Dist.] Apr. 25, 1985, no pet.) (mem. op., not designated for publication) (same).

Because it is plausible that Davis's trial counsel did not wish to inflame the jury or the court or highlight certain facts by continuously objecting to Martinez's testimony, and because it is likely that Davis's trial counsel was aware of case law stating that the deadly weapon need not be found in order to sustain a conviction, we cannot say that the actions

19

of Davis's trial counsel were so outrageous as to overcome the presumption of reasonable assistance.  *See Roberts*, 220 S.W.3d at 533; *Goodspeed*, 187 S.W.3d at 392; *see also Thompson*, 9 S.W.3d at 813-14.  Accordingly, we overrule Davis's fourth issue.

## IV. Conclusion

Having overruled all of Davis's issues on appeal, we affirm.

DORI CONTRERAS GARZA,
Justice

Do not publish.
Tex. R. App. P. 47.2(b).
Memorandum Opinion delivered and
filed this the 23rd day of April, 2009.

20